IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SECURITIES AND EXCHANGE
COMMISSION,

        Civil No. 06-1353-MO

      Plaintiff,

        OPINION AND ORDER

   v.

C. WESLEY RHODES, JR. et al.,

      Defendants.


   The Securities and Exchange Commissioner ("SEC") brought suit alleging that defendant

C. Wesley Rhodes, Jr. fraudulently misappropriated investor funds entrusted to him, in violation

of federal securities laws.  Specifically, the SEC alleges that starting in the 1990s, Mr. Rhodes

and companies he controlled, including Rhodes Econometrics, Inc., The Rhodes Company, and

Resource Transactions, Inc., raised money from individual investors by representing that the

money would be invested in stock or bond funds or portfolios.  (Am. Compl. (#79) ¶¶ 3, 12.)

However, Mr. Rhodes did not use the investors' money to invest in stocks and bonds, instead he

used the funds for other purposes, including purchasing automobiles and sports memorabilia.

(*Id.* ¶ 3.)  The SEC contends that by engaging in this conduct, Mr. Rhodes violated several

federal securities laws and regulations, including 15 U.S.C. §§ 77q(a), 78j(b), 80b-6(1)-(2), and

17 C.F.R. § 240.10b-5.

   The matter now before the court is the SEC's Motion for Summary Judgment (#394),

filed March 9, 2009.  A response to the Motion for Summary Judgment was due from Mr.

PAGE 1 - OPINION AND ORDER

Rhodes on March 23, 2009.  When no response was received by the court, an Order to Show

Cause (#401) was issued on March 30, 2009, requiring that Mr. Rhodes appear in writing within

20 days of the date of the order, to show cause why the SEC's Motion for Summary Judgment

should not be granted.  No response to the Order to Show Cause has been received by this court.

Mr. Rhodes has failed to demonstrate that there is a genuine issue of material fact

regarding the amount by which Mr. Rhodes profited from his fraud.  Therefore, I GRANT the

SEC's Motion for Summary Judgment (#394) and order disgorgement of Mr. Rhodes ill-gotten

gains in the amount of $11,887,096.  I award pre-judgment interest at the interest rate used by the

Internal Revenue Service ("IRS") for the underpayment of federal income taxes as set forth in 26

U.S.C. § 6621(a)(2).  Finally, I order Mr. Rhodes to pay a third-tier civil penalty of $130,000.

## BACKGROUND

The SEC filed suit against Mr. Rhodes on September 21, 2006.  The same day, this court

entered a Temporary Restraining Order ("TRO") (#15) freezing Mr. Rhodes's assets and those of

his companies, appointing a temporary receiver, prohibiting the destruction of documents, and

requiring an accounting.  An Order of Preliminary Injunction (#60) extending the TRO was

signed October 30, 2006, and a permanent receiver was appointed.  Based on consent settlement

agreements, Judgments of Permanent Injunction were entered against Mr. Rhodes (#127),

Resource Transactions (#124), The Rhodes Company (#125), and Econometrics (#126), on May

24, 2007.

By agreeing to the entry of the Judgment of Permanent Injunction (#127), Mr. Rhodes,

without admitting or denying the allegations in the Amended Complaint (#79), consented to the

entry of a final judgment permanently enjoining him from future violations of various federal

securities laws.  (Consent (#99) ¶ 2.)  The Judgment provides that for the purposes of a motion

for disgorgement and/or civil penalties, the allegations of the Amended Complaint shall be

accepted as and deemed true by this court.  (J. Perm. Inj. (#127) ¶ IV.)

<strong>STANDARD OF REVIEW</strong>

Summary judgment is proper when "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court views the

record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  If the

movant initially shows that no genuine issue of fact exists for trial, the non-moving party cannot

then rest on the pleadings but must respond with evidence setting out "specific facts showing a

genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  The non-moving party has the "burden of

advertising [sic] to 'specific facts showing that there is a genuine issue for trial.' . . . It is not the

district court's job to sift through the record to find admissible evidence in support of a non-

moving party's case." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

When "the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Further, a district court may grant an

unopposed motion for summary judgment if the movant's papers are sufficient to support the

motion and do not on their face reveal a genuine issue of material fact. *See Henry v. Gill*, 983

F.2d 943, 949-50 (9th Cir. 1993).

PAGE 3 - OPINION AND ORDER

**DISCUSSION**

## I.    Disgorgement of Ill-Gotten Gains

District courts have "broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of federal securities laws." *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006) (quoting *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998)). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *Id.* (quoting *First Pac. Bancorp*, 142 F.3d at 1191).

This court "also has broad discretion in calculating the amount to be disgorged." *Id.* (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996)). The amount of disgorgement ordered by the court should include "all gains flowing from the illegal activities." *Id.* at 1114 (quoting *SEC v. Cross Fin. Servs.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995)). But the SEC need not determine the exact amount of illegal profit gained by the defendant, "[a] disgorgement calculation requires only a 'reasonable approximation of profits causally connected to the violation.'" *Id.* at 1113-14 (quoting *First Pac. Bancorp*, 142 F.3d at 1192 n.6). Once the SEC has provided this approximation, the burden "shifts to the defendant to demonstrate that the SEC's estimate is not . . . reasonable." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)). "Exactitude is not a requirement; '[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty.'" *Id.* (quoting *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).

The SEC has met its burden of demonstrating that $11,887,096 is a reasonable approximation of Mr. Rhodes's ill-gotten gains.  They have alleged that starting in the 1990s, Mr. Rhodes, through various business entities, raised millions of dollars from investors by informing them that he would place their funds in separate, side, or managed accounts and invest them in a bond fund, a convertible stock fund, or some other type of pooled investment fund or portfolio, or directly in stocks and bonds.  (Am. Compl. (#79) ¶ 12.)  The Amended Complaint further alleges that Mr. Rhodes "misappropriated and misused most of the investor funds."  (*Id.* ¶ 25.)  As evidence, the SEC contends that Mr. Rhodes sent a quarterly account statement to more than sixty investors in July 2006, showing that their investments were valued at nearly $40 million, as of June 30, 2006.  (*Id.*)  "However, as of September 2006, [Mr.] Rhodes and the companies he controlled had less than $2 million invested in stocks and bonds."  (*Id.*)  For the purposes of this motion, these allegations are accepted as true.  (*See* J. Perm. Inj. (#127) ¶ IV.)

A forensic accountant analyzed account statements, cancelled checks, deposit slips, credit and debit advices, and other bank and investment account materials for Econometrics and The Rhodes Company for the period January 1, 2000 through September 21, 2006.  (Gadawski Decl. (#398) ¶¶ 5-6.)  The accountant found that Mr. Rhodes exercised control over the accounts and routinely diverted funds for his personal benefit.  (*Id.* ¶¶ 7, 11.)  During the period described, the accountant "concluded that investor funds totaling $10,863,917 were diverted for Rhodes'[s] and his family's personal use."  (*Id.* ¶12.)  This amount does not include any "disbursements for business expenses or distributions to investors;" rather, it includes uses such as the purchase of life insurance, automobile purchases and restoration, and the payment of credit card and phone bills.  (*Id.* ¶¶ 12, 15.)

There is an additional $1,023,178 which the accountant could not categorize because the information from the financial institutions and from the records of Econometrics and The Rhodes Company were insufficient to classify the disbursements as a personal or business expenses. (*Id.* ¶ 18.) The SEC has included this amount in their request for disbursement. Mr. Rhodes has the burden of demonstrating that this amount is unreasonable. *Calvo*, 378 F.3d at 1217 (citing *First City Fin. Corp.*, 890 F.2d at 1232). He has not responded to this motion for summary judgment to dispute the total amount of disbursement requested by the SEC or the classification of this $1,023,178 as part of the illegal profit he gained from his investors. It is reasonable to rely on the forensic accountant and to include unlabeled withdrawals and disbursements in the disgorgement amount, therefore I hold that Mr. Rhodes must disgorge $11,887,096 in ill-gotten gains.

## II.    Payment of Pre-judgment Interest

As discussed above, disgorgement should include "all gains flowing from the illegal activities." *JT Wallenbrock*, 440 F.3d at 1114 (quoting *Cross Fin. Servs.*, 908 F. Supp. at 734). Therefore, disgorgement generally includes pre-judgment interest, ensuring that wrongdoers do not profit from their fraud. *Cross Fin. Servs.*, 908 F. Supp. at 734 (citing *SEC v. Lund*, 570 F. Supp. 1397, 1404 (C.D. Cal. 1983)). The appropriate rate for pre-judgment interest is equal to the rate of post-judgment interest mandated by 28 U.S.C. § 1961, unless the district court determines that the equities of the case require a different rate. *W. Pac. Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984).

In this case, I find that the equities favor awarding pre-judgment interest at a different rate than that used in § 1961. In his settlement with the SEC, Mr. Rhodes agreed that if disgorgement was ordered by this court, he would pay pre-judgment interest calculated based on the rate of

PAGE 6 - OPINION AND ORDER

interest used by the IRS for the underpayment of federal income tax, as set forth in 26 U.S.C. § 6621(a)(2). (J. Perm. Inj. (#127) ¶ IV.) I therefore hold that Mr. Rhodes must pay pre-judgment interest on the disgorgement amount calculated based on the rate set forth in § 6621(a)(2). At this rate, the pre-judgment interest on Mr. Rhodes's illegal profits calculated through February 28, 2009, is $4,694,784. (Moser Decl. (#397) ¶ 6, Ex. D.) Interest has continued to accrue at a rate of $2,271.49 per day since February 28, 2009. (*Id.* ¶ 7.)

## III.   Imposition of a Civil Penalty

Federal securities laws provide for monetary civil penalties to be imposed against violators. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3), 80b-9(e). These civil penalties are meant to both punish the individual wrongdoer and to deter future securities laws violations. *SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001) (quoting *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996)). Generally, "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances" of the case. 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i), 80b-9(e)(2)(A).

The securities laws provide for three "tiers" of penalties, depending on the severity of the violation involved. A third tier penalty is appropriate when the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii), 80b-9(e)(2)(C). For conduct occurring after February 14, 2005, the third tier imposes a maximum limit for each violation by a natural person at the greater of either $130,000, or the "gross amount of pecuniary gain" to the

defendant as a result of the violation. *Id.*; 17 C.F.R. § 201.1003 & Table III (adjusting the penalties for inflation).

The SEC has alleged that Mr. Rhodes misappropriated and misused investor funds, spending money intended by the investors to be used to purchase stocks and bonds on his personal and family expenses. (Am. Compl. (#79) ¶¶ 25-26.) Mr. Rhodes told his investors the funds and portfolios were worth nearly $40 million, when they were actually worth only $2 million. (*Id.* ¶ 25.) For the purposes of this motion, these allegations are accepted as true. (*See* J. Perm. Inj. (#127) ¶ IV.)

By fraudulently using investor funds for his personal expenses and failing to invest large portions of the money entrusted to him, Mr. Rhodes necessarily caused substantial losses for his investors. A third tier penalty is therefore appropriate. This court may award $130,000 for each violation after February 14, 2005,[1] or even the gross amount of pecuniary gain to Mr. Rhodes from his fraud, which would be in the millions of dollars. Instead, the SEC has requested only a $130,000 penalty. Considering the circumstances described above, I require Mr. Rhodes to pay a civil penalty of $130,000.

## CONCLUSION

For the foregoing reasons, I GRANT the SEC's Motion for Summary Judgment (#394) and order disgorgement of Mr. Rhodes ill-gotten gains in the amount of $11,887,096. I award pre-judgment interest at the interest rate used by the IRS for the underpayment of federal income

---

[1] And $120,000 for each violation between February 2, 2001, and February 15, 2005. 17 C.F.R. § 201.1002 & Table II.

taxes as set forth in 26 U.S.C. § 6621(a)(2).  Finally, I order Mr. Rhodes to pay a third-tier civil penalty of $130,000.

IT IS SO ORDERED.

DATED this  4th  day of May, 2009.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

PAGE 9 - OPINION AND ORDER